```
               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY


JOAN MAERTIN, et al.,           HONORABLE JEROME B. SIMANDLE

          Plaintiffs,           CIVIL NO. 01-5321 (JBS)

     v.
                                OPINION
ARMSTRONG WORLD INDUSTRIES,
 INC., et al.,

          Defendant.
```

APPEARANCES:

Gary D. Ginsberg, Esquire
LAW OFFICE OF GARY D. GINSBERG
3000 Atrium Way
Suite 101
Mount Laurel, New Jersey  08054
     Attorney for Plaintiffs

James N. Lawlor, Esquire
Adam G. Brief, Esquire
GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, New Jersey 07102
     Attorneys for Defendant Armstrong World
     Industries, Inc.

John C. Sullivan, Esquire
POST & SCHELL, ESQS.
Adams Place, Suite 3
701 White Horse Road
Voorhees, New Jersey 08043
     Attorney for Defendants Liberty Mutual Insurance Co. and
     Michael Carroll

Copernicus T. Gaza, Esquire
TRAUB, EGLIN, LIEBERMAN, STRAUS
Metroplex Corporate Center I
100 Metroplex Drive
Suite 203
Edison, New Jersey 08817
     Attorney for Defendant OneBeacon Insurance Co., formerly CGU
     Group, successor to Potomac Insurance Co.

Laura M. Spear, Esquire
John Lawson, Esquire
WHITE and WILLIAMS, LLP
Liberty View
457 Haddonfield Road
Suite 400
Cherry Hill, New Jersey 08002
    Attorneys for Defendants Central National
    Insurance Co. of Omaha and International Insurance Company

Paul Piantino, Esquire
Robert F. Priestley, Esquire
MENDES & MOUNT, ESQS.
One Newark Center
19th Floor
Newark, New Jersey 07102
    Attorneys for Defendants Certain London Market Insurance
    Companies and Certain Underwriters at Lloyd's London

**SIMANDLE**, District Judge:

In this declaratory judgment action arising out of the $7,000,000 settlement in this Court of a products liability toxic tort suit against Armstrong World Industries, Inc. ("Armstrong" or "AWI"), Plaintiffs seek a determination as a matter of law of the allocation of insurance coverage among the Defendant insurers.

Cross-motions for summary judgment have been filed by Plaintiffs [Docket Item 100,] Defendants Certain Underwriters at Lloyd's, including Peter Cameron Webb, and London Market Insurance Companies [Docket Item 102,] and Defendant Liberty Mutual Insurance Co. [Docket Item 105,] and the Court has been asked to separately consider the choice-of-law issues that arise in the context of these motions. Oral argument was heard on February 9, 2005.

For the reasons explained herein, the Court will apply New Jersey law to the allocation of insurance coverage relating to the progressive indivisible injury suffered by Plaintiffs.

**I.   BACKGROUND**

A.   *Maertin I* Settlement

This matter arises from two related actions filed in the United States District Court for the District of New Jersey, Maertin, et al. v. Armstrong World Industries, Inc., No. 95-2849 (JBS), ("Maertin I"), and Schmoll v. Armstrong World Industries, Inc., No. 99-3497 (JBS).[1]  Plaintiffs had either contracted, or feared contracting, cancer as a result of their exposure to ceiling tiles manufactured by Armstrong and installed in their workplace at Burlington County College.[2]  Armstrong manufactured and distributed the ceiling tiles from about August 1968 to April 1970; they were coated with a plasticizer that included the carcinogen polychlorinated biphenyl ("PCB").

---

[1] Schmoll v. Armstrong World Industries, Inc., No. 99-3497(JBS), was administratively terminated without prejudice on December 6, 1999.

[2] Patricia Barnes was a plaintiff in the original Maertin Complaint.  Her claims were dismissed without prejudice from that suit on December 27, 1999.  Following the $7,000,000 settlement between the Maertin Plaintiffs and Armstrong, Patricia Barnes passed away from cancer.  A complaint was filed against Armstrong by her estate, alleging that the ceiling tiles installed by Armstrong at Burlington Community College were the cause of her cancer.  According to Liberty, a settlement in principle has now been reached between Armstrong and the Barnes plaintiffs in the amount on $500,000.  (Liberty Summ. J. Br. at 4.)

The case was heavily litigated until the parties reported a settlement on September 14, 2000.  This Court issued an order of dismissal and the parties entered into a "Settlement Agreement and Mutual General Release."  On September 20, 2000, Armstrong filed <u>Armstrong World Industries, Inc. v. Central National Insurance Co. of Omaha, et al.</u>, Civil Number 00-4763, in the Eastern District of Pennsylvania against its insurance carriers seeking a declaration of coverage for the settlement amount.  The settlement agreement was signed by all parties on or before November 22, 2000; Armstrong signed the agreement on November 6, 2000.  Under the terms of the agreement, Armstrong was to make the $7,000,000 payment on or before January 21, 2001.

On December 6, 2000, however, Armstrong filed for bankruptcy under Chapter 11 in the District of Delaware.  Armstrong, continuing to operate its business as a debtor in possession, notified Plaintiffs of the bankruptcy action and reminded them that any collection action was stayed by the Bankruptcy Code's automatic stay provision.  Plaintiffs filed for relief from the automatic stay on March 29, 2001 to seek payment of the settlement amount.  On December 10, 2001 the Honorable Joseph J. Farnan, United States District Judge for the District of Delaware, filed a memorandum order lifting the stay to allow Plaintiffs to pursue the enforcement of the settlement agreement.

Meanwhile, on November 14, 2001, before the actual written order was entered, Plaintiffs filed the instant action against Armstrong, Liberty Mutual Insurance Co., Central National Insurance Co. of Omaha, Certain London Market Insurance Companies, CGU Group, Equitas Reinsurance Limited, First State Insurance Co., International Insurance Co., Puritan Insurance Co., and Peter E. J. Cameron-Webb for a declaratory judgment that the insurers pay the settlement agreement amount and against Armstrong, Liberty Mutual Insurance Company, Michael Carroll, and Bethann Jakoboski for money damages for fraud, bad faith, and concealment during the settlement negotiations ("Maertin II").

On November 30, 2001, Plaintiffs filed a Notice of Motion to Enforce Settlement as to Defendant Armstrong in Maertin I.  The Honorable Joel B. Rosen, in a Report and Recommendation filed pursuant to 28 U.S.C. § 636(b)(1)(B), found that this Court has jurisdiction to enforce the settlement agreement, that the settlement agreement is a valid and binding agreement, and that this Court has authority to enforce the agreement even though the bankruptcy court has exclusive jurisdiction to compel the debtor's payment of the settlement amount.[3]  (Report and

---

[3] On March 28, 2002 this Court dismissed without prejudice Defendants Michael Carroll, First State Insurance Co., and Westport Insurance Co., successor to Puritan Insurance Co. [Docket Items 29-1, 30-1.]  On April 10, 2002, Plaintiffs filed an amended complaint, and on April 17, 2002, Plaintiffs filed a second amended complaint.  [Docket Items 31-1, 32-1.] Plaintiffs filed a third amended complaint on October 18, 2002. [Docket Item 46.]

5

Recommendation.)  After considering Defendant Armstrong's objections, on September 5, 2002 this Court affirmed Judge Rosen's Report and Recommendation and entered judgment against Defendant Armstrong in the amount of $7,000,000 so that the Plaintiffs could compel payment in the United States Bankruptcy Court.

On May 3, 2002, the Honorable Randall J. Newsome, United States Bankruptcy Judge for the District of Delaware, signed a stipulation and order agreed upon by Plaintiffs and Armstrong which stated that Plaintiffs could proceed against Armstrong's insurance policies because the bankruptcy stay had been lifted to allow such an action and because Plaintiffs held the "equivalent" of a judgment returned unsatisfied from Armstrong.

During the pendency of this matter, Liberty Mutual, the primary carrier for Armstrong, agreed to a partial settlement with Plaintiffs in the amount of $3,000,000.  Plaintiffs maintain that the Liberty settlement did not affect their rights to collect additional payment from Liberty Mutual in the event a Court was to find the "excess carriers" were not responsible for any portion of the remaining $4,000,000.  As noted above, the "excess carriers" are CGU/One Beacon Group, Central National Insurance Company, Certain London Market Insurance Companies, and International Insurance Company.

B.   Relevant Insurance Policies

Armstrong purchased insurance coverage from a variety of insurers beginning in 1973.

1.   Liberty Mutual Primary Policies

Armstrong first purchased primary coverage from Liberty beginning in January 1973.  Liberty continued to insure Armstrong until the 1990's.  (Liberty Summ. J. Br. at 5.)  The Liberty policies in effect from January 1, 1973 to January 1, 1986 were "occurrence policies" – "[e]ach policy had a $1,000,000 per occurrence limit for personal injury."  (Id.)  According to Liberty, the Liberty policies in effect from January 1, 1973 to January 1, 1977 have previously been exhausted.  (Id.)

Each of the Liberty occurrence policies included:  (1) a "Declarations" schedule identifying the dollar limits for the different types of coverage provided; (2) a "Limits of Liability" section specifying how the dollar figures identified in the Declarations page apply to different claims; and (3) the "General Amendatory Endorsement" which provides that "all 'personal injury' and 'property' damage arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered arising out of one occurrence" and that each occurrence is to be reduced by the amount of each payment made by Liberty under another policy.  (Id. at 5-6; Exs. E, G.)

7

Beginning on January 1, 1986, all of the Liberty policies issued to Armstrong were "claims-made" policies. (Id.) The claims-made policy covering the period January 1, 1988 to January 1, 1989 was "modified by endorsement to allow an unlimited reporting period for PCB claims." (Id.) That policy had a $2,000,000 per occurrence limit for personal injury. Beginning with the policy commencing January 1, 1989, all of the Liberty policies contained a PCB exclusion. (Id.)

### 2. International and Central National Excess Liability Policies

Plaintiffs' claims against Defendants International Insurance Company and Cravens, Dargan Co., Pacific Coast, as managing general agent of Central National Insurance Co. of Omaha ("ACE USA Companies") are made under two excess liability policies issued by Central Nation and six excess liability policies issued by International. (Certain Defs. Opp. to Pls. Summ. J. Br. at 6.) Three of the International policies are first layer excess policies with per occurrence and aggregate limits of $5 million excess of the $1 million Liberty primary policies. (Id.) The Central National policies and other International policies are second layer excess policies with greater underlying limits. (Id.)

### 3. OneBeacon Excess Liability Policies

OneBeacon's predecessor, Potomac Insurance Company ("Potomac"), issued two excess catastrophe liability policies to Armstrong, effective for the periods January 1, 1982 to January 1, 1983 and January 1, 1983 to August 1, 1983, respectively. (Id.)  Each of these policies is subject to limits of liability of $5 million each occurrence and in the aggregate (where applicable) excess $1 million in primary insurance or a $10,000 retained limit.  (Id.)

### 4. London Market Excess Policies

According to the Third Amended Complaint, there are six insurance policies subscribed by Defendants Certain Underwriters at Lloyd's, including Peter Cameron-Webb, and London Market Insurance Companies ("London Market Insurers" or "London Market") at issue here.  Those policies cover 1/1/1977 through 1/1/1979 and 1/1/1981 through 1/1/1982.  (London Market Summ. J. Br. at 3.)  Each of these policies sits in excess of at least a $1 million primary policy.

**II. DISCUSSION**

    A.   <u>Choice-of-Law</u>

Plaintiffs brought this declaratory action pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, seeking a determination of the allocation of insurance coverage among certain of the Defendant insurers. As already noted, the parties have filed cross-motions for summary judgment.[4] The Court's discussion will be limited to a choice-of-law analysis as it pertains to those motions.

The underlying tort action in <u>Maertin I</u> involved the exposure of 14 academic employees to PCB's from ceiling tiles, manufactured by Defendant Armstrong, at Burlington County College in Pemberton, New Jersey. For present purposes only, the Court accepts Plaintiffs' representation that the various insurance contracts were entered into in the Commonwealth of Pennsylvania. The issue before the Court, then, is whether the law of New Jersey or that of Pennsylvania applies to the apportionment of responsibility among the insurance carriers for payment of the $7,000,000 settlement amount.

---

[4] AWI, having been granted summary judgment by the Court's Opinion and Order dated December 11, 2002 [Docket Item 50] and having negotiated dismissal of the other claims filed against it, takes no position as to the merits of these motions. (AWI Response ¶ 6.)

None of the parties disputes that the Court is required to apply New Jersey choice-of-law rules in this diversity case. Klaxton v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); McFarland v. Miller, 14 F.3d 912, 917 (3d Cir. 1994). This Court has had the opportunity once before to apply New Jersey choice of law rules in this case.

> As the forum state, New Jersey choice of law rules apply. New Jersey abandoned the traditional lex loci contractus rule which required application of the law of the place where the contract was entered in favor of the flexible "governmental interest" approach which focuses on the state that has the most significant connections with the litigation. Gilbert Spruance v. Pa. Mfrs., 134 N.J. 96, 102 (1993) (citing State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28 (1980)). Under the governmental interest approach, the court must first determine whether there is an actual conflict between the competing laws.[5]

Maertin I, 241 F.Supp.2d 431, 450 n.7 (D.N.J. 2002).

In applying New Jersey choice of law rules generally, the Third Circuit has looked to the Restatement (Second) Conflicts (1971). See NL Indus., Inc. v. Commercial Union Ins. Co., 65 F.3d 314 (3d Cir. 1995). "According to Restatement section 188, the general rule in contract actions is that the law of the state with the most significant relationship to the parties and the transaction under the principles stated in Restatement section 6 governs." Gilbert, 629 A.2d at 102. Section 6 of the

---

[5] The Court concluded that as to the issue of whether Plaintiffs had a direct right to relief against Armstrong, because the statutes cited by the parties were identical, the forum law should apply. Maertin I, 241 F.Supp.2d at 450 n.7.

11

Restatement (Second) Conflicts lists the following factors to be considered:

    (a)   the needs of the interstate and international systems;

    (b)   the relevant policies of the forum;

    (c)   the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

    (d)   the protection of justified expectation;

    (e)   the basic policies underlying the particular field of law;

    (f)   certainty, predictability and uniformity of result; and

    (g)   ease in the determination and application of the law to be applied.

Restatement (Second) Conflicts (1971) § 6.  Section 6 should be read in conjunction with § 193, stating that

> [t]he validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Restatement (Second) Conflicts § 193 (1971).  See Gilbert, 629 A.2d at 103.

### B. Allocation of Insurance Coverage Under Pennsylvania and New Jersey Law

The central issue before the Court is how the settlement liability should be allocated among Liberty Mutual, the primary carrier, and the excess carriers – CGU/OneBeacon Group, Central National Insurance Co., Certain London Market Insurance Companies, and International Insurance Company. Plaintiffs, as well as Defendants Ace and OneBeacon, argue that the Court should apply New Jersey law to resolve this issue, while Liberty maintains that Pennsylvania law should govern.[6] In deciding what law to apply, the Court must first "determine whether a conflict exists between the interested states." Veazey v. Doremus, 510 A.2d 1187, 1191 (N.J. 1986).

#### 1. Pennsylvania Law

The Supreme Court of Pennsylvania has rejected the "chronological and seriatim method of allocation," J.H. France Refractories Co. v. Allstate Ins. Co. ("France III"), 626 A.2d 502 (Pa. 1993), in favor of the theory of "joint-and-several allocation." Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co., 25 F.3d 177, 181 (3d Cir. 1994) (rejecting the lower court's apportionment method, under Pennsylvania law, in favor of "joint and several allocation" allowing the insured to select the policy under which it is to be

---

[6] For purposes of this motion, London Market Defendants agree that New Jersey law should apply. (London Summ. J. Br. at 1.)

indemnified).

> Under France III, as the allocation applies to the duty to indemnify, if more than one policy is triggered, the insured "should be free to select the policy or policies under which it is to be indemnified." When the policy limits of the chosen policy are exhausted, then the insured is entitled to choose again from the triggered policies and continue to do so until fully indemnified for the claims. In regard to the allocation of the liability associated with the duty to defend, the Supreme Court [of Pennsylvania] held that the insurers have the right to select which of the insurers will undertake a defense. If the insurers cannot decide, then the insured may designate which insurer it wishes to have defend the claims.

Air Products II, 25 F.3d at 181 (citing France III, 626 A.2d at 508-10) (internal citations omitted)). Under the theory of joint-and-several allocation, "the problem of indivisible injury is resolved simply by collapsing the continuous injury into one year." Carter-Wallace v. Admiral Ins., 712 A.2d 1116, 1121 (N.J. 1998).

    2.   New Jersey Law

New Jersey, on the other hand, has explicitly "rejected joint-and-several allocation." Carter-Wallace, 712 A.2d at 1121. Under New Jersey law, "when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a [comprehensive general liability] policy. That is the continuous-trigger theory for activating the insurers' obligation to respond under the policies." Owens-Illinois, Inc. v. United

14

Insur. Co., 650 A.2d 974, 995 (N.J. 1994). "Because multiple policies of insurance are triggered under the continuous-trigger theory . . . a fair method of allocation appears to be one that is related to both the time and the degree of risk assumed." Id.

Carter-Wallace involved "the availability and allocation of insurance coverage for costs incurred at an environmental cleanup site in Monmouth County. Specifically, it require[d] [the court] to determine how the responsibility of an excess insurer is measured in the context of environmental damage with a continuous trigger of liability over many years." 712 A.2d at 1119. The plaintiff in that declaratory judgment action, a manufacturer of pharmaceutical and consumer products, sought defense reimbursement and indemnity from over twenty insurers for costs it incurred for cleanup of a contaminated waste disposal site. The plaintiff ultimately settled with all but one of its insurers, that insurer having provided to the plaintiff "a second-layer excess policy," the amount of which was in excess of the "underlying primary and first-layer excess coverage." Id. at 1120.

The parties there put forth alternative arguments for allocation, both of which were rejected by the court. On the one hand, Commercial Union, the issuer of the second-layer excess policy, "relie[d] on its policy language that require[d] the underlying limits of coverage to be exhausted before liability

15

attache[d] under its second-level excess policy.  Fairly read, that provision require[d] the vertical depletion of the relevant policies in effect during the time of the excess policy's coverage," but did not apply "to future policies that had not been written or signed at the time this second-layer excess policy was issued."  Id. at 1123.  The plaintiff, on the other hand, proposed a "solution [that was] premised on the assumption that an excess layer policy can be allocated if the entire loss sustained during a continuous-trigger period [was] treated as if it occurred in only one year. . . .  That technique most closely resemble[d] [a] joint-and-several allocation method . . . ."  Id.

In rejecting the arguments put forth by the parties, and in being faithful to the doctrine that "any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure," the court there applied Judge Brotman's decision in Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co., 978 F. Supp. 589 (D.N.J. 1997).  As summarized by the Carter-Wallace court, Chemical Leaman Tank Lines "involved a plaintiff that sought coverage for costs incurred as a result of environmental contamination.  The insurers argued that each layer of insurance must be exhausted across all of the triggered policy years before the next layer would be allocated . . . ."  Carter-Wallace, 712 A.2d at 1123.  The court in Chemical Leaman ultimately "rejected the theory of

16

horizontal exhaustion by layer, and 'directed apportionment of damages among policy years without reference to the layering of policies in the triggered years.'  However, the court did note that within any given year, each layer of excess coverage must be depleted before the next level is pierced." Id. at 1123-24.

In other words, the court in Chemical Leaman, "having reached a figure for each year, . . . adopted a method that vertically allocated each policy in effect for that year, beginning with the primary policy and proceeding upward through each succeeding excess layer." Id. at 1124.  Thus, for example,

> [a]ssume that primary coverage for one year was $100,000, first-level excess insurance totaled $200,000, and second-level excess coverage was $450,000.  If the loss allocated to that specific year was $325,000, the primary insurer would pay $100,000, the first-level excess policy would be $200,000, and the second-level excess policy would pay $25,000.

Id. According to the New Jersey Supreme Court, this solution most fairly allocates risk based on the time and degree of the risk assumed by the insured.  Id.; see Owens-Illinois, 650 A.2d at 995.

17

    C.    <u>New Jersey Has the Greater Interest In Having Its Law Applied To The Issue of Coverage Allocation</u>

As elucidated by the foregoing, there is a clear conflict between the law of New Jersey and Pennsylvania as to the issue of insurance coverage allocation involving progressive indivisible injury. Accordingly, the Court must evaluate which of these two states has "the greatest interest in governing [this] particular issue." <u>Veazey</u>, 510 A.2d at 1191.

The New Jersey Supreme Court has identified the interests implicated by the allocation of insurance coverage in cases such as this. Those governmental interests include "simple justice" as well as the need for "the most efficient use of resources available to cope with" asbestos-related harm. <u>Owens-Illinois</u>, 650 A.2d at 992-93. As the New Jersey Supreme Court has made clear, the continuous-trigger model is more capable of effectively addressing those interests than the theory of joint-and-several liability utilized under Pennsylvania law. Indeed, that court recognized as much when it explicitly rejected the joint-and-several theory of liability in favor of the continuous trigger model. <u>Id.</u>

Because New Jersey has a greater interest than Pennsylvania in applying its law to the instant coverage dispute, the Court will apply New Jersey law to the issue of insurance coverage allocation.

**III. CONCLUSION**

As the foregoing discussion illustrates, there is a marked difference between the laws of New Jersey and Pennsylvania on the issue of insurance allocation as it pertains to progressive indivisible injury.  Because New Jersey has the more significant interest in applying New Jersey law to this case, this Court will apply New Jersey law to the instant coverage dispute.


**June 15, 2005**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     U.S. District Judge