```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| JOAN MAERTIN, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>ARMSTRONG WORLD INDUSTRIES,<br>INC., et al.,<br><br>          Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>CIVIL NO. 01-5321 (JBS)<br><br>**OPINION** |

APPEARANCES:

Gary D. Ginsberg, Esquire
LAW OFFICE OF GARY D. GINSBERG
3000 Atrium Way
Suite 101
Mount Laurel, New Jersey  08054
     Attorney for Plaintiffs

James N. Lawlor, Esquire
Adam G. Brief, Esquire
GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, New Jersey 07102
     Attorneys for Defendant Armstrong World
     Industries, Inc.

John C. Sullivan, Esquire
POST & SCHELL, ESQS.
Adams Place, Suite 3
701 White Horse Road
Voorhees, New Jersey 08043
     Attorney for Defendants Liberty Mutual Insurance Co. and
     Michael Carroll

Copernicus T. Gaza, Esquire
TRAUB, EGLIN, LIEBERMAN, STRAUS
Metroplex Corporate Center I
100 Metroplex Drive
Suite 203
Edison, New Jersey 08817
     Attorney for Defendant OneBeacon Insurance Co., formerly CGU
     Group, successor to Potomac Insurance Co.

Laura M. Spear, Esquire
John Lawson, Esquire
WHITE and WILLIAMS, LLP
Liberty View
457 Haddonfield Road
Suite 400
Cherry Hill, New Jersey 08002
    Attorneys for Defendants Central National
    Insurance Co. of Omaha and International Insurance Company

Paul Piantino, Esquire
Robert F. Priestley, Esquire
MENDES & MOUNT, ESQS.
One Newark Center
19th Floor
Newark, New Jersey 07102
    Attorneys for Defendants Certain London Market Insurance
    Companies and Certain Underwriters at Lloyd's London

**SIMANDLE**, District Judge:

This is a declaratory judgment action arising out of the $7,000,000 settlement of a products liability toxic tort suit against Armstrong World Industries, Inc. ("Armstrong" or "AWI"), in which Plaintiffs seek a determination as a matter of law of the allocation of insurance coverage among the Defendant insurers.  On June 15, 2005, the Court issued an Opinion and Order holding that New Jersey law applies to the allocation of insurance coverage relating to the progressive indivisible injury suffered by Plaintiffs.[1]  Subsequently, Defendant Liberty Mutual

---

[1] Plaintiffs, Defendants Certain Underwriters at Lloyd's, including Peter Cameron Webb, and London Market Insurance Companies, and Defendant Liberty Mutual Insurance Co. had previously moved for summary judgment.  At oral argument on the summary judgment motions, the Court was asked to separately consider the choice-of-law issue.  The motions for summary judgment are still pending.

Insurance Company moved to amend the Court's June 15, 2005 Order under 28 U.S.C. § 1292(b) to certify the choice-of law issue as a controlling question of law. For the following reasons, the Court will grant the motion and, pursuant to Section 1292(b), stay the proceedings in this Court pending a determination by the Court of Appeals.

**I.    BACKGROUND**

The Court will only recite those facts that bear upon the instant motion under Section 1292(b).

A.    <u>Underlying Tort-Related Litigation</u>

This matter arises from two related actions filed in the United States District Court for the District of New Jersey, <u>Maertin, et al. v. Armstrong World Industries, Inc.</u>, No. 95-2849 (JBS), ("<u>Maertin I</u>"), and <u>Schmoll v. Armstrong World Industries, Inc.</u>, No. 99-3497 (JBS). Plaintiffs had either contracted, or feared contracting, cancer as a result of their exposure to ceiling tiles manufactured by Armstrong and installed in their workplace at Burlington County College. Armstrong manufactured and distributed the ceiling tiles from about August 1968 to April 1970; they were coated with a plasticizer that included the carcinogen polychlorinated biphenyl ("PCB").

The case was heavily litigated until the parties reported a settlement on September 14, 2000. This Court issued an order of dismissal and the parties entered into a "Settlement Agreement

and Mutual General Release."[2]  On November 14, 2001, Plaintiffs filed the instant action against Armstrong, Liberty Mutual Insurance Co., Central National Insurance Co. of Omaha, Certain London Market Insurance Companies, CGU Group, Equitas Reinsurance Limited, First State Insurance Co., International Insurance Co., Puritan Insurance Co., and Peter E. J. Cameron-Webb for a declaratory judgment that the insurers pay the settlement agreement amount, and against Armstrong, Liberty Mutual Insurance Company, Michael Carroll, and Bethann Jakoboski for money damages for fraud, bad faith, and concealment during the settlement negotiations ("Maertin II").

B.   Relevant Insurance Policies

Armstrong purchased insurance coverage from a variety of insurers beginning in 1973.  As noted in the Court's June 15, 2005 Opinion, for present purposes the Court accepts Plaintiffs' representation that these various insurance contracts were entered into in the Commonwealth of Pennsylvania.

---

[2] On September 20, 2000, Armstrong filed suit in the Eastern District of Pennsylvania against its insurance carriers seeking a declaration of coverage for the settlement amount.  Under the terms of the agreement, Armstrong was to make the $7,000,000 payment on or before January 21, 2001.  On December 6, 2000, however, Armstrong filed for bankruptcy under Chapter 11 in the District of Delaware.  On December 10, 2001, the Honorable Joseph J. Farnan, United States District Judge for the District of Delaware, filed a memorandum order lifting the Bankruptcy Code's automatic stay provision to allow Plaintiffs to pursue the enforcement of the settlement agreement in this Court.

1.   Liberty Mutual Primary Policies

Armstrong first purchased primary coverage from Liberty beginning in January 1973.  Liberty continued to insure Armstrong until the 1990's.  (Liberty Summ. J. Br. at 5.)  The Liberty policies in effect from January 1, 1973 to January 1, 1986 were "occurrence policies" – "[e]ach policy had a $1,000,000 per occurrence limit for personal injury."  (Id.)

Each of the Liberty occurrence policies included:  (1) a "Declarations" schedule identifying the dollar limits for the different types of coverage provided; (2) a "Limits of Liability" section specifying how the dollar figures identified in the Declarations page apply to different claims; and (3) the "General Amendatory Endorsement" which provides that "all 'personal injury' and 'property' damage arising out of continuous or repeated exposure to substantially the same general conditions . . . shall be considered arising out of one occurrence" and that each occurrence is to be reduced by the amount of each payment made by Liberty under another policy.  (Id. at 5-6; Exs. E, G.)

Beginning on January 1, 1986, all of the Liberty policies issued to Armstrong were "claims-made" policies.  (Id.)  The claims-made policy covering the period January 1, 1988 to January 1, 1989 was "modified by endorsement to allow an unlimited reporting period for PCB claims."  (Id.)  That policy had a $2,000,000 per occurrence limit for personal injury.  Beginning

with the policy commencing January 1, 1989, all of the Liberty policies contained a PCB exclusion.  (Id.)

### 2. International and Central National Excess Liability Policies

Plaintiffs' claims against Defendants International Insurance Company and Cravens, Dargan Co., Pacific Coast, as managing general agent of Central National Insurance Co. of Omaha ("ACE USA Companies") are made under two excess liability policies issued by Central Nation and six excess liability policies issued by International.  (Certain Defs. Opp. to Pls. Summ. J. Br. at 6.)  Three of the International policies are first layer excess policies with per occurrence and aggregate limits of $5 million excess of the $1 million Liberty primary policies.  (Id.)  The Central National policies and other International policies are second layer excess policies with greater underlying limits.  (Id.)

### 3. OneBeacon Excess Liability Policies

OneBeacon's predecessor, Potomac Insurance Company ("Potomac"), issued two excess catastrophe liability policies to Armstrong, effective for the periods January 1, 1982 to January 1, 1983 and January 1, 1983 to August 1, 1983, respectively. (Id.)  Each of these policies is subject to limits of liability of $5 million each occurrence and in the aggregate (where applicable) excess $1 million in primary insurance or a $10,000 retained limit.  (Id.)

      4.   <u>London Market Excess Policies</u>

According to the Third Amended Complaint, there are six insurance policies subscribed by Defendants Certain Underwriters at Lloyd's, including Peter Cameron-Webb, and London Market Insurance Companies ("London Market Insurers" or "London Market") at issue here. Those policies cover 1/1/1977 through 1/1/1979 and 1/1/1981 through 1/1/1982. (London Market Summ. J. Br. at 3.) Each of these policies sits in excess of at least a $1 million primary policy.

    C.   <u>June 15, 2005 Opinion and Order</u>

At oral argument on the motions for summary judgment filed by Plaintiffs, Defendants Certain Underwriters at Lloyd's, and Defendant Liberty Mutual Insurance Co., the Court was asked to separately consider the choice-of-law issue, which it did. In an Opinion and Order dated June 15, 2005, the Court determined that New Jersey substantive law applies to the allocation of insurance coverage relating to the progressive indivisible injury suffered by Plaintiffs.

**II. DISCUSSION**

    A.   <u>Choice-of-Law Question</u>

The Court will take this opportunity to elaborate upon its June 15, 2005 Opinion and Order holding that New Jersey substantive law applies to this dispute, as Defendant Liberty Mutual appears to misconstrue that Opinion's reasoning. <u>See</u>

Mantech Envtl. Corp. v. Hudson Env. Services, 152 F.3d 1368, 1369 n.3 (3d Cir. 1998) (recognizing that district court maintains jurisdiction to refine or modify an earlier opinion until the notice of appeal is filed).

This Court, sitting in diversity, was constrained to apply New Jersey's law regarding choice-of-law in the first instance. Klaxton v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); McFarland v. Miller, 14 F.3d 912, 917 (3d Cir. 1994). When faced with choosing the law applicable to declaring insurance coverage liability, the Supreme Court of New Jersey has indicated that the following factors merit consideration and weighing:

- (a) the needs of the interstate and international systems;
- (b) the relevant policies of the forum;
- (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
- (d) the protection of justified expectation;
- (e) the basic policies underlying the particular field of law;
- (f) certainty, predictability and uniformity of result; and
- (g) ease in the determination and application of the law to be applied.

Gilbert Spruance v. Pa. Mfrs., 134 N.J. 96, 102 (1993) (citing State Farm Mutual Automobile Insurance Co. v. Estate of Simmons, 84 N.J. 28, 34 (1980)); see Restatement (Second) Conflicts (1971) §§ 6, 193. New Jersey courts favor this "more flexible approach

focused on determining which state has the most meaningful connections with and interests in the transaction and the parties." NL Industries, Inc. v. Commercial Union Insurance Co., 65 F.3d 314, 319 (3d Cir. 1995) ("NL I") (citing State Farm, 84 N.J. 28; Gilbert Spruance, 134 N.J. 96; Colonial Penn Ins. Co. v. Gibson, 230 N.J. Super. 55 (App. Div. 1989)).  Therefore, "[i]n coverage cases, New Jersey courts have elected to analyze not only the policies involved in interpreting insurance law but also those policies underlying their . . . tort laws." NL I, 65 F.3d at 324 (citing Diamond Shamrock Chemicals Co. v. Aetna Casualty & Ins. Co., 258 N.J. Super. 157, 198 (App. Div. 1992) (citing Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 N.J. Super. 51, 57 (App. Div. 1991))).

In the choice-of-law motion practice here, several of the defendant insurers argued for application of New Jersey law, while Liberty Mutual argued for Pennsylvania law.  The Court recognized that, if there were some automatic rule that under New Jersey choice-of-law principles the place of contracting supplies the rule of decision, none of the parties are aware of it. Nonetheless, Liberty Mutual appears to portray this as a settled issue compelling application of Pennsylvania law, notwithstanding the requirement of weighing the competing governmental interests of New Jersey and Pennsylvania under the circumstances of this case and the underlying tort case.

In holding that New Jersey substantive law applies to this action, the Court explicitly recognized the governmental interests in "simple justice" as well as the need for "the most efficient use of resources available to cope with" toxic tort-related harm.  (Slip Op. at 18.)  Implicit in that conclusion was the recognition that New Jersey courts may consider "not only the policies involved in interpreting insurance law but also those policies underlying their . . . tort law."  NL I, 65 F.3d at 324-25.  Indeed, the Third Circuit has observed that "New Jersey courts seek to avoid the frustration of the interests and policies expressed in their substantive laws that could occur through narrow interpretation of the coverage available under the applicable insurance contracts."  Id. at 326 ("[A] state's interest in determining the scope of liability in the underlying . . . claim does bear on the scope of coverage.")

Here, the underlying dispute was undoubtedly governed by New Jersey law.  The settlement of the underlying claims, like the several prior Opinions addressing the merits of the underlying claims and defenses, were also squarely based on New Jersey law.  Additionally, the Court concluded in 2002 that the question of whether Plaintiffs had a direct right to relief against Armstrong would be governed by New Jersey law.  Maertin I, 241 F. Supp. 2d at 450 n.7.  New Jersey has an interest in applying its laws to coverage disputes involving actions whose underlying merits were

10

adjudicated under New Jersey law, as with this case.  NL I, 65 F.3d at 324.  To be sure, the Court previously accepted that Pennsylvania was the place of contracting for the relevant insurance contracts.  The Court held, though, that New Jersey's interest in carrying out the policies expressed in its substantive tort law outweighed any expectation that Pennsylvania law would apply to the instant coverage dispute.  In any event, as the Third Circuit recognized in NL I, the parties here may also have expected that the law of the state where the harms ultimately occurred would apply.  NL I, 65 F.3d at 328.  Accordingly, the Court determined that New Jersey law applies to the instant coverage dispute.

Liberty Mutual Insurance Co. argues that NL I dictates the contrary conclusion; that Pennsylvania, not New Jersey law, should apply here.  In NL I, the plaintiff sought a declaration that it was entitled to product liability insurance coverage for a large number of lawsuits alleging lead paint exposure.  The underlying tort actions there arose in either Pennsylvania or Louisiana.  In reversing the district court's determination under New Jersey choice-of-law rules that New Jersey's substantive law applied to the insurance coverage dispute, the Third Circuit held that New Jersey did not have the "dominant relationship" with the "parties and the underlying issue[s] . . . ."  Id. (quoting State

Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28 (1980)). Several factors were fundamental to that conclusion.

First, the court held that it was "[s]ignificant[]" that none of the underlying tort claims involved New Jersey plaintiffs. NL I, 65 F.3d at 316. Second, the harms giving rise to the underlying litigation occurred in Pennsylvania and Louisiana, not New Jersey. Next, the court discussed that New New Jersey's only connection with the litigation was that NL Industries was incorporated there (though its headquarters and principal place of business were in New York). Id. Finally, the Court considered that each of the parties had their principal places of business in New York. Id. In light of these factors, the court held that the substantive law of the place of contracting, New York, should apply to that coverage dispute.[3] Id.

The considerations which guided the choice-of-law determination in NL I, however, are not present here. First,

---

[3] To be sure, the court did recognize that, "while it is arguable that the states where the lead paint claims arose had a relationship to the transaction, we do not believe that they have the 'dominant and significant relationship' necessary to displace the law of New York, which is the law of the place of contracting, of performance, and of the tort." NL I, 65 F.3d at 316. However, none of the parties in that action argued that either Pennsylvania's or Louisiana's law should apply. Id. at 325 n.9. In any event, as discussed below, in this case New Jersey has a greater relationship to the litigation than simply the place where the underlying claims arose. The Court finds those differences dispositive.

almost all of the Plaintiffs in the underlying tort action here are New Jersey residents.[4]  Second, none of the Defendant insurers are Pennsylvania companies.  Moreover, the harms giving rise to the underlying litigation all occurred in New Jersey, where Burlington County College is located.  Finally, and significantly, the underlying action was brought under and governed by New Jersey law.  The Court's choice-of-law decision in this insurance dispute was made "in an effort to protect New Jersey's tort policies."  See 65 F.3d at 324-25.  And, "as the New Jersey Supreme Court has made clear, the continuous-trigger model is more capable of effectively addressing those interests than the theory of joint-and several liability utilized under Pennsylvania law."  (Slip Op. at 18.)

These policy considerations, taken together with the fact that the injuries complained of were sustained in New Jersey, by New Jersey citizens, attributable to Armstrong's product installed in New Jersey, and that the underlying tort action was governed by New Jersey law, support the Court's conclusion that the law of the forum should apply to this "tort-related" action. In these circumstances, these interests outweigh Pennsylvania's interest in applying Pennsylvania law to the various liabilities of out-of-state insurers for tort liability arising in New

---

[4] Though the Complaint identifies Florida as the current residence of a small number of Plaintiffs, Florida has no other relationship to this litigation.

Jersey.  While the automatic application of Pennsylvania law to liability of insurers covering a Pennsylvania insured could promote predictability and ease in the determination of the law to be applied, the same could be said for every simplistic approach to choice-of-law, such as the outdated rules of <u>lex loci delicti</u> (the law of the place where the accident happened) or <u>lex loci contractus</u> (the law of the place of contracting) which, though appealingly simple, have been rejected by New Jersey's choice-of-law principles and those of almost every other state in modern times.  Moreover, even the Pennsylvania insured – Armstrong – does not argue for the application of Pennsylvania law to this dispute, electing to take no position.  (<u>See</u> Armstrong's Response to Cross-Motions, Dec. 1, 2004, at ¶¶ 6-7.)

    B.   <u>Section 1292(b)</u>

Liberty Mutual Insurance Co. has asked the Court to amend its June 15, 2005 Order to certify the choice-of-law question under 28 U.S.C. § 1292(b).  Section 1292(b) "imposes three criteria for the district court's exercise of discretion to grant a § 1292(b) certificate.  The order must (1) involve a 'controlling question of law,' (2) offer 'substantial ground for a difference of opinion' as to its correctness, and (3) if appealed immediately 'materially advance the ultimate termination

14

of the litigation.'"[5]  Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir.), cert. denied, 419 U.S. 885 (1974).

In NL Industries, Inc. v. Commercial Union Insurance Co., 154 F.3d 155, 156 (3d Cir. 1998) ("NL II"), NL sought coverage for environmental pollution at 93 sites in 28 states.  In the course of pretrial proceedings, the parties agreed to select as representative locations sites in Illinois and Oregon to explore the choice-of-law questions.  The district court then certified as a controlling question of law under 28 U.S.C. § 1292(b) whether the law of Illinois or Oregon applied to interpreting the relevant policies.  Recognizing that the choice-of-law question was "basic to the litigation," the Third Circuit agreed to accept the question for review.  Id.  See Garcia v. Plaza Oldsmobile Ltd., 421 F.3d 216 (3d Cir. 2005) (granting leave to appeal

---

[5] 28 U.S.C. § 1292(b) provides, in pertinent part:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such an order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

pursuant to 28 U.S.C. § 1292(b) to review the district court's grant of partial summary judgement as to the choice-of-law issue in a dispute arising from a motor vehicle accident); Simon v. Fare, 341 F.3d 193 (3d Cir. 2003) (holding choice-of-law question in a negligence action under the Federal Tort Claims Act was "a clear case for § 1292(b) certification").  But see Foster v. Maldonado, 433 F.2d 348, 349 (3d Cir. 1970) (denying petition for leave to take interlocutory appeal under Section 1292(b) regarding choice-of-law issue where the laws of New Jersey and Pennsylvania were largely the same and any ultimate appeal would likely be in a posture for complete and final disposition).

As in the above cited cases, this Court will certify the choice-of-law issue for immediate appeal under Section 1292(b). First, the choice-of-law determination is a controlling question of law in that reversal of that decision by the Court of Appeals will result in the application of a different jurisdiction's substantive law to the primary issue.  Katz, 496 F.2d at 754. And, as the Court previously discussed at length, the allocation

16

schemes of New Jersey and Pennsylvania are markedly different.[6] (See Slip Op. 13-17.)

Additionally, there is substantial ground for a difference of opinion as to the choice-of-law question.  See NL II, 154 F.3d at 156 (accepting for review under Section 1292(b) the choice-of-law question in an insurance coverage dispute).  As this Court's discussion illustrates, an examination of the relevant contacts and interests, see NL I; Restatement of Conflict (Second) §§ 6 and 188, requires consideration of a number of factors, no one being dispositive.  And, while the Court obviously believes that New Jersey law should apply, in light of the court's decision in NL I to apply the law of the place of contracting in an insurance coverage dispute, albeit under circumstances this Court believes to be dispositively different from those presented here, the Court finds that the instant case satisfies the second of the three prerequisites to interlocutory appeal.

---

[6] Beyond substantive issues, the choice-of-law determination may also impact how as a practical matter the allocation is ultimately made.  While this Court will no doubt take an active role in the management and resolution of the instant controversy regardless of which state's laws apply, only New Jersey case law suggests that the "trial court may repose a large measure of discretion in a special master to aid the court in developing a formula for allocation of the costs of defense and indemnity." Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 449 (1994).  While appointment of a special master is governed by Rule 53(a), Fed. R. Civ. P., regardless of whether New Jersey or Pennsylvania substantive law ultimately applies, there is no indication that Pennsylvania courts recommend utilizing a special master for determinations of coverage, as in New Jersey.

Finally, an immediate appeal may materially advance the ultimate termination of the litigation.  Specifically, a final determination of the choice-of-law issue will provide the parties with certainty as to the scope of financial exposure if the case were to proceed to trial, which differs depending on whether New Jersey or Pennsylvania law is applied.[7]  (<u>See</u> Slip Op. 13-17.)

### III. CONCLUSION

For the foregoing reasons, the Court will grant the motion by Liberty Mutual Insurance Co. and, pursuant to Section 1292(b), certify the following question for interlocutory appeal:

> Whether the District Court correctly decided, under New Jersey's choice-of-law principles, that New Jersey law should apply in determining the allocation of responsibility among insurers for the New Jersey settlement of two toxic tort suits brought by multiple New Jersey residents involving alleged exposure in New Jersey to ceiling tiles sold by Defendant Armstrong World Industries, Inc., where the place of contracting for Armstrong's insurance was in Pennsylvania.

Further, this Court will stay the proceedings pending the Court of Appeals' consideration of the interlocutory appeal.

**March 29, 2006**                                           **s/ Jerome B. Simandle**
Date                                                           JEROME B. SIMANDLE
                                                             U.S. District Judge

---

[7] As this Court has noted once before, this final requirement is closely tied to the pre-requisite that the order involve a controlling question of law.  <u>Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.</u>, 830 F. Supp. 1549, 1557 (D.N.J. 1993), <u>aff'd</u> <u>in</u> <u>part</u>, <u>rev'd</u> <u>in</u> <u>part</u>, 50 F.3d 1239 (3d Cir. 1995).